**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Caremark LLC, et al., | No. CV-24-00082-PHX-ROS |
| Plaintiffs, | No. CV-24-00092-PHX-ROS |
| v. | **ORDER** |
| Cherokee Nation, et al., | |
| Defendants. | |
| and | |
| Caremark LLC, et al., | |
| Plaintiffs, | |
| v. | |
| Cherokee Nation, et al., | |
| Defendants. | |

The Cherokee Nation and the Muscogee (Creek) Nation own and operate pharmacies that provide medication and services to members of those nations. Caremark and its affiliated companies entered into agreements with the pharmacies under which Caremark agreed to provide pharmacy benefit management services. Those agreements included language requiring the parties arbitrate any disputes. In 2023, the Nations filed separate suits against Caremark in the Eastern District of Oklahoma, alleging Caremark improperly denied and underpaid claims made by the pharmacies. In 2024, Caremark filed the present suits, seeking orders compelling the parties to resolve their disputes via

arbitration. Other judges in the District of Arizona have compelled arbitration in almost identical situations and the Ninth Circuit affirmed one of those orders. The Ninth Circuit's ruling establishes the petitions to compel arbitration in these cases must be granted.

**BACKGROUND**[1]

The Cherokee Nation and the Muscogee (Creek) Nation operate pharmacies where members of the nations can obtain prescriptions and other services. Each nation has a contractual relationship with Caremark for Caremark to provide services to the pharmacies. As relevant here, Caremark's services relate to the pharmacies being paid for prescriptions and services. The contract between each nation and Caremark is found in "two key documents: the Provider Agreement and the Provider Manual." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1025 (9th Cir. 2022). The Provider Agreement is a short document that incorporates the Provider Manual. *Id.* The Provider Manual is a lengthy document that "governs all aspects of a pharmacy's relationship with Caremark, including the process for submitting pharmacy claims." (Doc. 12 at 10). The Provider Manual contains the arbitration provision at issue in these cases.

Section 15.09 of the Provider Manual is titled "Arbitration." That section provides, in relevant part,

> Any and all disputes between Provider and Caremark . . . including, but not limited to, disputes in connection with, arising out of, or relating in any way to, the Provider Agreement or to Provider's participation in one or more Caremark networks or exclusion from any Caremark networks, will be exclusively settled by arbitration. This arbitration provision applies to any dispute arising from events that occurred before, on, or after the effective date of this Provider Manual. . . . Unless otherwise agreed to in writing by the parties, the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to the then applicable AAA Commercial Arbitration Rules and Mediation Procedures including the rule governing Emergency Measures of Protection (available from the AAA). . . .

(Doc. 8-18 at 100). All arbitrations under this provision must occur in Scottsdale, Arizona.

The same section of the Provider Manual requiring arbitration also contains what is

---

[1] The citations to the record are from CV-24-82 but the record in CV-24-92 contains the same documents.

known as a "delegation clause."  A "delegation clause" is "a clause requiring the arbitrator, rather than courts, to resolve threshold issues about the scope and enforceability of the arbitration provision."  *Caremark*, 43 F.4th at 1026.  The Provider Manual's delegation clause states,

> The arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of the agreement to arbitrate including, but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason.

(Doc. 8-18 at 100).

The Nations and Caremark operated under versions of the Provider Agreement and Provider Manual for years and the contractual relationships appear to be ongoing.  On August 3, 2023, the Nations filed separate suits against Caremark in the District Court for the Eastern District of Oklahoma.  The complaints in those suits explain each nation operates numerous pharmacies dispensing prescriptions and providing other services to members of the Nations.  Pursuant to federal law, the members "receive health care (including pharmacy services) at [Nations'] facilities at no charge."  (Doc. 1-1 at 5).  To "recoup the costs of covered services," federal law grants the Nations the right to recover some of the costs "from any applicable insurance coverage the [Nation member] may have."  (Doc. 1-1 at 5).  In other words, if a member of the Nations has private health insurance, and that member receives a prescription at a facility operated by a Nation, the member will not pay the Nation for that prescription, but the Nation has a statutory right to seek payment from the member's health insurer.  (Doc. 1-3 at 30).  The statute granting Nations this entitlement is referred to as the "Recovery Act."  25 U.S.C. § 1621e.

The Recovery Act provides a Nation "may enforce the right of recovery" provided by the statute by "instituting a separate civil action."  25 U.S.C. § 1621e(e)(1).  The Recovery Act also provides "no provision of any contract . . . shall prevent or hinder the right of recovery."  25 U.S.C. § 1621e(c).  According to the Nations, the language of the Recovery Act grants them an entitlement to file lawsuits and no contractual provision, such as an arbitration provision, can remove that entitlement.

A few months after the Nations filed their complaints in Oklahoma, counsel for Caremark sent letters to the Nations requesting the parties engage in the "pre-arbitration dispute-resolution process" required under the parties' contracts. (Doc. 1-2 at 1). The Nations responded with letters stating the contractual "dispute resolution provisions," including the arbitration requirement, were not enforceable. (Doc. 1-3 at 2). Caremark then filed two separate petitions to compel arbitration in this District. The only relevant difference between the two petitions is the petition in CV-24-82 involves the Cherokee Nation and its pharmacies while the petition in CV-24-92 involves the Muscogee (Creek) Nation and its pharmacies. Caremark filed the petitions in Arizona because the arbitration provisions require all arbitrations occur in Scottsdale. The Nations responded to the petitions by arguing the Court should wait for the Eastern District of Oklahoma to act in the suits pending in that district. (Doc. 1, 18). The Nations make a variety of other arguments against compelling arbitration, such as the language of the Recovery Act renders the arbitration provisions unenforceable.

The Cherokee Nation and Muscogee (Creek) Nation are not the first nations to file suits against Caremark alleging violations of the Recovery Act. In 2020, the Chickasaw Nation sued Caremark in the Eastern District of Oklahoma alleging violations of the Recovery Act. In 2021, the Choctaw Nation filed a similar suit, also in the Eastern District of Oklahoma. Those cases prompted Caremark to file separate petitions to compel arbitration in the District of Arizona. The District of Arizona judges assigned those petitions issued orders compelling arbitration. In 2022, the Ninth Circuit affirmed the order compelling the Chickasaw Nation to proceed to arbitration. The order compelling the Choctaw Nation to proceed to arbitration was appealed but no decision has been issued. The Ninth Circuit's opinion addressing the Chickasaw Nation provides sufficient guidance such that there is no need to await a result in the Choctaw Nation appeal before resolving the current petitions.

## ANALYSIS

Most of the arguments presented by the Nations were considered and rejected by

the Ninth Circuit in *Caremark v. Chickasaw Nation*, 43 F.4th 1021 (9th Cir. 2022). The facts and governing documents in that case were effectively the same as the facts and documents in the current cases. In seeking reversal of the order compelling arbitration, the Chickasaw Nation offered the Ninth Circuit "two reasons why its Recovery Act claims [were] not arbitrable." *Id.* at 1028. First, the Chickasaw Nation claimed there was no indication it had "clearly and unequivocally waived its tribal sovereign immunity." *Id.* Second, the nation argued "the Recovery Act itself precludes the enforcement of any agreement to arbitrate." *Id.* The Ninth Circuit rejected both reasons but, before doing so, the Ninth Circuit provided the framework courts must apply when resolving contested petitions to compel arbitration.

The first step when ruling on a petition to compel arbitration is to "resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause." *Id.* at 1030. If an agreement was formed, "a court must . . . resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability." *Id.* If an arbitration agreement was formed, and there is no valid challenge specifically to the delegation clause, "all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance." *Id.*

The Ninth Circuit concluded the Chickasaw Nation and Caremark had an agreement. Based on "the hundreds of thousands of claims the [Chickasaw] Nation has submitted to Caremark over the last several years . . . the Nation [could not] plausibly deny that it formed contracts with Caremark." *Id.* at 1031. It was undisputed those contracts contained "arbitration provisions with delegation clauses." *Id.*

Given the indisputable formation of agreements containing arbitration provisions with delegation clauses, the Ninth Circuit turned to whether the Chickasaw Nation was making any challenge "directed specifically to the enforceability of the delegation clause." *Id.* at 1030. The Ninth Circuit recognized the Chickasaw Nation was arguing the language of the Recovery Act meant compelling arbitration would be improper. But the Ninth

Circuit concluded "[t]he Nation's theory that the Recovery Act displaces the arbitration provisions . . . does not impugn the validity of the delegation clauses specifically." *Id.* at 1033. Instead, the argument that the language of the Recovery Act prohibits arbitration was "a challenge to the enforceability of the arbitration provisions as a whole." *Id.* Because the Chickasaw Nation's argument based on the Recovery Act was not a "challenge directed specifically to the enforceability of the delegation clause," the parties had to proceed to arbitration where the arbitrator would resolve "any challenge to the validity of the [arbitration agreement] as a whole." *Id.* at 1033.

Despite the reasoning in *Chickasaw Nation* that the Recovery Act did not preclude sending that case to arbitration, the Nations in the current cases make an almost identical argument.[2] The Nations' current argument, however, appears to recognize the need to focus on the delegation clause. Accordingly, the Nations argue "the existence of a delegation clause cannot override the express will of Congress in precluding any contractual provision that 'prevents or hinders' the Nation[s'] rights under the Recovery Act, including the right to maintain a civil action." (Doc. 18 at 8-9). This argument relies on giving the terms in the Recovery Act very specific meanings. Again, that statute grants the Nations a statutory right to "enforce the right of recovery . . . by . . . instituting a separate civil action." 25 U.S.C. § 1621e(e)(1). The Recovery Act further provides "no provision of any contract . . . shall prevent or hinder the right of recovery of . . . an Indian tribe." 25 U.S.C. § 1621e(d). The Nations interpret this language to mean the Recovery Act guarantees them the right to file "civil actions" in district court and any contractual provision preventing or hindering that right, such as the delegation clause, is not

---

[2] The Nations make a preliminary argument that Caremark should have filed motions to compel arbitration in the pending Eastern District of Oklahoma cases. (Doc. 18 at 8). The Nations go so far as to argue Caremark has "no legitimate reason for filing [its] Petition[s] in this Court." (Doc. 18 at 8). The Nations already know the precise reason Caremark filed the petitions to compel in the District of Arizona. As mentioned in *Chickasaw Nation*, the Tenth Circuit law binding on the Eastern District of Oklahoma prohibits district courts from compelling arbitration outside of their districts. 43 F.4th at 1028 n.5. That is, "where the parties agreed to arbitrate in a particular forum only a district court in that forum has authority to compel arbitration." *Ansari v. Qwest Commc'ns Corp.*, 414 F.3d 1214, 1219–20 (10th Cir. 2005). Based on that rule, Caremark could not file motions to compel arbitration in the pending Eastern District of Oklahoma cases because that court cannot compel arbitration in Arizona.

- 6 -

enforceable.

Because the Nations' argument under the Recovery Act is specifically aimed at the enforceability of the delegation clause, the Court must resolve the issue. *Chickasaw Nation*, 43 F.4th at 1029. Fortunately, the result is straightforward. Courts must "enforce agreements to arbitrate according to their terms" unless the Federal Arbitration Act ("FAA") "has been "overridden by a contrary congressional command." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012). A party arguing Congress intended to override the FAA "faces a stout uphill climb." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). The intention to do so must be "must be clear and manifest." *Id.* The language of the Recovery Act is not sufficiently clear to override application FAA.

Congress "knows how to override the [FAA] when it wishes—by explaining, for example, that, '[n]otwithstanding any other provision of law, . . arbitration may be used . . . only if' certain conditions are met; or that '[n]o predispute arbitration agreement shall be valid or enforceable' in other circumstances; or that requiring a party to arbitrate is 'unlawful' in other circumstances yet." *Epic Sys.*, 584 U.S. at 514 (statutory citations omitted). The language of the Recovery Act, however, does not explicitly reference arbitration or the FAA. Instead, the language of the Recovery Act is like other vague statutory language that has been found insufficiently clear.

In 1991 the Supreme Court addressed whether the Age Discrimination in Employment Act of 1967 ("ADEA") contained sufficiently clear language to override the FAA such that agreements requiring arbitration of claims brought under the ADEA could not be enforced. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 29 (1991). The ADEA "read, in part: "Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter." *CompuCredit*, 565 U.S. at 101 (quoting 29 U.S.C. § 626(c)). The Supreme Court concluded this language allowing an individual to bring a "civil action" in a "court of competent jurisdiction" was not a sufficiently clear indication that Congress wished to override the FAA. *Gilmer*, 500 U.S. at 29.

Similarly, in *CompuCredit Corp. v. Greenwood*, 565 U.S. 95 (2012), the statutory provision at issue included "repeated use of the terms 'action,' 'class action,' and 'court.'" *Id.* at 100. The party resisting arbitration in that case argued those terms "call to mind a judicial proceeding" such that any agreement to arbitrate was not enforceable. *Id.* The Supreme Court disagreed, reasoning "[i]t is utterly commonplace for statutes that create civil causes of action to describe the details of those causes of action, including the relief available, in the context of a court suit." *Id.* Merely using terms often associated with proceedings in court is not "sufficient to establish the contrary congressional command overriding the FAA." *Id.*

Here, the Recovery Act prohibits any contract from hindering a Nation from "instituting a separate civil action." 25 U.S.C. § 1621e(e)(1). That language falls well short of the demanding standard to override the FAA. In fact, the language of the Recovery Act is less indicative of such an intent than the language of the ADEA entitling a plaintiff to file "a civil action in any court." *CompuCredit*, 565 U.S. at 101 (quoting 29 U.S.C. § 626(c)). The Recovery Act does not preclude enforcement of the delegation clause.

The Nations make two additional arguments against compelling arbitration. The first argument was rejected in *Chickasaw Nation* and the second argument was rejected in cases prior to *Chickasaw Nation*. First, the Nations argue they cannot be forced to arbitrate their disputes because they did not waive their sovereign immunity. (Doc. 18 at 12). The Ninth Circuit rejected this argument. *Chickasaw*, 43 F.4th at 1032-33. According to the Ninth Circuit, "a tribal organization might agree to arbitrate any disputes for which it has waived sovereign immunity but still reserve its ability to choose whether to waive immunity in any given case." *Id.* at 1032. It would be inappropriate for a court "to resolve whether there has been a waiver of tribal immunity for particular claims for which arbitration is sought before determining whether an arbitration agreement exists at all." *Id.* at 1033. This language appears to mean that "[w]hen an arbitration agreement contains a delegation clause . . . a court need not resolve any sovereign-immunity implications but, instead, must only decide whether an arbitral agreement exists and, if so, then delegate to

the arbiter gateway questions of arbitrability (including whether an Indian tribe waived sovereign immunity)." *Sovereign immunity—Effect of arbitration on sovereign immunity*, 2 Commercial Arbitration § 40:81. The Nations are free to make their sovereign immunity argument in the arbitrations.

The Nations' final argument is arbitration cannot be required because the parties' agreement is "unconscionable." This argument is not aimed specifically at the delegation clause. The Ninth Circuit has long held that when there is a delegation clause, a general argument that the entire contract is unconscionable is for an arbitrator to resolve. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1133 (9th Cir. 2015) (noting a party seeking to avoid arbitration must argue the unconscionability of the delegation clause itself and not the unconscionability of the arbitration agreement as a whole). Therefore, the Nations' unconscionability argument must be presented to the arbitrator.

Consistent with *Chickasaw Nation*, the Court must compel arbitration. Current Ninth Circuit law would allow the Court to compel arbitration and dismiss these suits but the Supreme Court is considering whether the language of the FAA allows for dismissal in these circumstances. *Forrest v. Spizzirri*, 62 F.4th 1201, 1204 (9th Cir. 2023), *cert. granted sub nom. Smith v. Spizzirri*, 144 S. Ct. 680 (2024). The parties will be required to file a joint statement indicating if the Court should stay or dismiss these cases.

Accordingly,

**IT IS ORDERED** the Petition to Compel (Doc. 12) in CV-24-82 and the Petition to Compel (Doc. 12) in CV-24-92 are **GRANTED**.

**IT IS FURTHER ORDERED** the Clerk of Court shall docket this Order in CV-24-82 and CV-24-92.

…

…

…

…

…

1  **IT IS FURTHER ORDERED** no later than **May 15, 2024**, the parties shall file a
2 joint statement in CV-24-82 stating whether the Court should stay or dismiss these actions.
3  Dated this 8th day of May, 2024.

>  Honorable Roslyn O. Silver
>  Senior United States District Judge